## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| DAVID GRENKE, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>HEARST COMMUNICATIONS, INC., a Delaware Corporation,<br><br>Defendant. | Case No. 12-14221<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff David Grenke brings this Class Action Complaint against Defendant Hearst Communications, Inc. ("Hearst") to obtain redress for all persons injured by Hearst's intentional and unlawful disclosure of Plaintiff's and its other subscribers' highly personal and sensitive information. For his Class Action Complaint ("Complaint"), Plaintiff alleges as follows upon personal knowledge as to himself and his own acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by his attorneys:

### NATURE OF THE CASE

1.      Hearst is an international media company that publishes over 300 magazines throughout the world, including widely-circulated magazines such as *Harper's Bazaar*, *Cosmopolitan*, *Esquire*, *Good Housekeeping, Redbook*, *Seventeen*, *Country Living*, and *O, the Oprah Magazine*.

2.      Unfortunately for its subscribers, Hearst isn't content with just making money from magazine sales. Instead, Hearst double dips by selling its subscribers' personal information —including, *inter alia*, their full names, titles of magazines subscribed to, and home addresses

1

(collectively "Personal Reading Information"), as well as myriad other personal, lifestyle, and demographic information, such as gender, purchasing habits, political affiliation, religious practice, charitable donations, and (when applicable) number, age, and gender of the subscriber's children—to data miners and other third parties.

3.      Hearst's disclosure of such personal, demographic, and lifestyle information is not only unlawful, but also dangerous because it allows scammers to target particularly vulnerable members of society. In fact, anyone can buy a customer list from Hearst that contains a number of categories of detailed subscriber information. For example, a purchaser could buy a list with the names and addresses of all *Good Housekeeping* subscribers over age 50, who are devoted Bible-reading Democrats with three teenage children and pet cats. Hearst would sell such a list for approximately $192 per thousand subscribers listed.

4.      While Hearst profits handsomely from such practices, its subscribers are completely unaware that their personal information is sold on the open market. In fact, Hearst never receives its customers' consent prior to selling their Personal Reading Information.

5.      By selling its customers' Personal Reading Information without their consent, Hearst not only disregards its customers' safety and basic privacy rights, but also violates Michigan's Video Rental Privacy Act, M.C.L. § 445.1712 ("VRPA"), which prohibits companies from disclosing without permission any record or information concerning a customer's purchase of written materials if the record identifies the customer.

6.      Accordingly, Plaintiff brings this Class Action Complaint against Hearst for its intentional and unlawful disclosure of its customers' Personal Reading Information in violation of the VRPA, for breach of contract, and, in the alternative to breach of contract, for unjust enrichment

## PARTIES

7.      Plaintiff David Grenke is a natural person and citizen of the State of Michigan.

8.      Defendant Hearst Communications, Inc. is a Delaware corporation with its principal place of business at 959 Eighth Avenue, New York, New York 10019. Hearst does business throughout Michigan and the United States.

## JURISDICTION AND VENUE

9.      This Court has personal jurisdiction over Hearst because it is registered to do, and regularly does, business in Michigan, including soliciting consumer business from, and entering into consumer transactions with, Michigan consumers. Further, the unlawful conduct alleged in the Complaint occurred in, was directed at, and/or emanated from, Michigan.

10.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because at least one Class member is a citizen of a different state than Defendant, the amount in controversy exceeds $5,000,000.00, exclusive of interest and costs, and none of the exceptions under that subsection apply to this action.

11.      Venue is proper in this Court under 28 U.S.C. § 1391(a) because a substantial part of the events and omissions giving rise to the claim occurred in this District. 28 U.S.C. § 1391(a)(2). Venue is additionally proper because Plaintiff resides within this District in Oakland County, and Defendant transacts significant business in this District, including soliciting consumer business and entering into consumer transactions.

## FACTUAL BACKGROUND

### *Michigan's Video Rental Privacy Act*

12.      In 1988, members of the United States Senate warned that records of consumers' purchases and rentals of audiovisual and written materials offer "a window into our loves, likes,

and dislikes," and that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599 at 7–8 (1988) (statements of Sens. Simon and Leahy, respectively).

13.     Recognizing the need to protect its citizens' privacy rights, Michigan's legislature enacted the VRPA "to preserve personal privacy with respect to the purchase, rental, or borrowing of certain materials," by prohibiting companies from disclosing certain types of sensitive consumer information. H.B. No. 5331, 1988 Mich. Legis. Serv. 378.

14.     Section 2 of the VRPA states:

> [A] person, or an employee or agent of the person, engaged in the business of selling at retail, renting, or lending books or other written materials . . . *shall not disclose* to any person, other than the customer, a record or information concerning the purchase . . . of those materials by a customer that indicates the identity of the customer.

M.C.L. § 445.1712 (emphasis added).

15.     Michigan's protection of reading information reflects the "gut feeling that people ought to be able to read books and watch films without the whole world knowing," and recognizes that "[b]ooks and films are the intellectual vitamins that fuel the growth of individual thought. The whole process of intellectual growth is one of privacy—of quiet, and reflection. This intimate process should be protected from the disruptive intrusion of a roving eye." S. Rep. No. 100–599, at 6 (Statement of Rep. McCandless.)

16.     Despite the fact that thousands of Michigan residents subscribe to Hearst publications, Hearst ignores its legal responsibility by systematically violating the VRPA.

### The Personal Information Market: Consumers Value Information Privacy

17.     In 2001, Federal Trade Commission ("FTC") Commissioner Orson Swindle

remarked that "the digital revolution . . . has given an enormous capacity to the acts of collecting and transmitting and flowing of information, unlike anything we've ever seen in our life . . . [and] individuals are concerned about being defined by the existing data on themselves."[1]

18.     More than a decade later, Commissioner Swindle's comments ring truer than ever, as consumer data feeds an information marketplace that supports a $26 billion dollar per year online advertising industry in the United States.[2]

19.     The FTC has also recognized that consumer data possesses inherent monetary value within the new information marketplace, and publicly stated that:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. *Data is currency. The larger the data set, the greater potential for analysis—and profit.*[3]

20.     It is now a nearly ubiquitous practice for companies that collect consumer information—such as names, addresses, and product purchase histories—to profit from sharing this data with numerous third parties, without ever disclosing such practices to or obtaining consent from the source consumer.

21.     In fact, an entire industry exists in which companies known as data miners purchase, trade, and otherwise collect massive databases of information about consumers. These companies then profit by selling this "extraordinarily intrusive" information in an open, and

---

[1]     The Information Marketplace: Merging and Exchanging Consumer Data (Mar. 13, 2001), http://www.ftc.gov/bcp/workshops/infomktplace/transcript.htm (last visited Sept. 19, 2012).

[2]     *See*, Web's Hot New Commodity: Privacy, WSJ.com (Feb. 27, 2011), http://online.wsj.com/article/SB10001424052748703529004576160764037920274.html (last visited Sept. 19, 2012).

[3]     Statement of FTC Commissioner Pamela Jones Harbour, http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf (last visited Sept. 19, 2012). (emphasis added).

largely unregulated, market.[4]

22.     The scope of data miners' knowledge of consumers is truly astounding: "If you are an American adult, the odds are that [they] know[] things like your age, race, sex, weight, height, marital status, education level, politics, buying habits, household health worries, vacation dreams—and on and on."[5]

23.     Recognizing the serious threat the data mining industry poses to consumers' privacy, on July 25, 2012, the co-Chairmen of the Congressional Bi-Partisan Privacy Caucus sent a letter to nine major data brokerage companies seeking information on how those companies collect, store, and sell their massive collections of consumer data.[6]

24.     In their letter, the co-Chairmen recognized that:

> [t]he business of data brokerage, namely the collecting, assembling, maintaining, and selling to third-parties of consumers' personal information, has grown into a multiple billion dollar industry. *By combining data from numerous offline and online sources, data brokers have developed hidden dossiers on every U.S. consumer.* This large[-]scale aggregation of the personal information of hundreds of millions of American citizens raises a number of serious privacy concerns.[7]

---

[4]     *See* Martha C. White, *Big Data Knows What You're Doing Right Now*, time.com (July 31, 2012), http://moneyland.time.com/2012/07/31/big-data-knows-what-youre-doing-right-now/ (last visited Sept. 19, 2012).

[5]     Natasha Singer, *You for Sale: Mapping, and Sharing, the Consumer Genome*, N.Y. Times (June 16, 2012), *available at* http://www.nytimes.com/2012/06/17/technology/acxiom-the-quiet-giant-of-consumer-database-marketing.html (last visited Sept. 19, 2012).

[6]     *See Bipartisan Group of Lawmakers Query Data Brokers About Practices Involving Consumers' Personal Information*, Website of Congressman Ed Markey (July 24, 2012), http://markey.house.gov/press-release/bipartisan-group-lawmakers-query-data-brokers-about-practices-involving-consumers%E2%80%99 (last visited Sept. 19, 2012).

[7]     Letter from Edward J. Markey and Joe Barton, co-Chairmen, Congressional Bi-Partisan Privacy Caucus, to Scott E. Howe, Chief Executive Officer, Acxiom (July 25, 2012) (available at http://markey.house.gov/sites/markey.house.gov/files/documents/Axciom%20letter.pdf) (emphasis added).

25.     Data mining is especially troublesome when consumer information is sold to direct marketing companies. In addition to causing waste and inconvenience, direct marketers often use information from subscriber lists to lure unsuspecting consumers into various scams,[8] including fraudulent sweepstakes, charities, and buying clubs. Thus, Hearst's actions contribute to the "[v]ast databases of names and personal information" that are often "sold to thieves by large publicly traded companies," which "put[s] almost anyone within the reach of fraudulent telemarketers" and other criminals.[9]

26.     Information disclosures like Hearst's are particularly dangerous to retirees, such as Plaintiff Grenke. "Older Americans are perfect telemarketing customers, analysts say, because they are often at home, rely on delivery services, and are lonely for the companionship that telephone callers provide."[10] The FTC notes that "[t]he elderly often are the deliberate targets of fraudulent telemarketers who take advantage of the fact that many older people have cash reserves or other assets to spend on seemingly attractive offers."[11]

27.     Indeed, an entire black market exists where the personal information of vulnerable elderly Americans is exchanged. Thus, information disclosures like Hearst's are particularly

---

[8]     *Prize Offers: You Don't Have to Pay to Play!*, Federal Trade Commission, http://www.ftc.gov/bcp/edu/pubs/consumer/telemarketing/tel17.shtm (last visited Sept. 19, 2012).

[9]     Charles Duhigg, *Bilking the Elderly, With a Corporate Assist*, N.Y. Times, May 20, 2007 at A1.

[10]     *Id.*

[11]     *Fraud Against Seniors: Hearing before the Senate Special Committee on Aging* (Aug. 10, 2000) (prepared statement of the FTC), *available at* http://www.ftc.gov/os/2000/08/agingtestimony.htm (last visited Sept. 19, 2012).

troublesome because of their cascading nature: "Once marked as receptive to [a specific] type of spam, a consumer is often bombarded with similar fraudulent offers from a host of scam artists."[12]

28.     Hearst is not alone in jeopardizing its subscribers' privacy and well-being in exchange for increased revenue: disclosing subscriber information to data miners, direct marketers, and other third parties is a widespread practice in the publishing industry.

29.     Thus, as consumer data has become an ever-more valuable commodity, the data mining industry has experienced rapid and massive growth. Unfortunately for consumers, this growth has come at the expense of their most basic privacy rights.

30.     In fact, consumers' personal information has become such a valuable commodity that companies are beginning to offer individuals the opportunity to sell their personal information themselves.[13]

31.     These companies' business models capitalize on a fundamental tenet underlying the personal information marketplace: consumers recognize the economic value of their private data. In fact, research shows that consumers are willing to pay a premium to purchase services from companies that adhere to more stringent policies of protecting their personal data.[14]

32.     Thus, in today's economy, individuals and businesses alike place a real,

---

[12]     *Id.*

[13]     *See* Joshua Brustein, *Start-Ups Seek to Help Users Put a Price on Their Personal Data*, N.Y. Times (Feb. 12, 2012), *available at* http://www.nytimes.com/2012/02/13/technology/start-ups-aim-to-help-users-put-a-price-on-their-personal-data.html (last visited Sept. 19, 2012).

[14]     Tsai, Cranor, Acquisti, and Egelman, *The Effect of Online Privacy Information on Purchasing Behavior*, 22(2) Information Systems Research 254, 254 (2011); *see also generally* European Network and Information Security Agency, *Study on monetising privacy* (Feb. 27, 2012), *available at* https://www.enisa.europa.eu/activities/identity-and-trust/library/deliverables/monetising-privacy (last visited Sept. 19, 2012).

quantifiable value on consumer data and corresponding privacy rights.[15] As such, where a business offers customers a service that includes statutorily guaranteed privacy protections, yet fails to honor these guarantees, the customer is denied the full monetary value of that transaction.

### *Hearst Unlawfully Sells its Subscribers' Personal Reading Information*

33.     Hearst maintains a vast digital database comprised of its subscribers' Personal Reading Information. Hearst discloses the Personal Reading Information to data mining companies including Insource and others, who then supplement that information with sensitive personal information about each Hearst subscriber, including gender, purchasing habits, political affiliation, religious practice, charitable donations, and (when applicable) number, age, and gender of the subscriber's children. (*See*, *e.g.*, Group Exhibit 1.)

34.     Hearst then sells its mailing lists—which include subscribers' Personal Reading Information, and can include the sensitive information obtained from data miners—to third parties, allowing those companies to identify which individuals purchased which magazines. (*See*, *e.g.*, Group Exhibit 1.)

35.     As a result of Hearst's data compiling and sharing practices, companies can purchase mailing lists from Hearst that identify Hearst subscribers by their most intimate details: income, political affiliation, religious practice, and charitable donations. Hearst's disclosure of such sensitive and personal information puts consumers, especially the more vulnerable members of society, at risk of serious harm from scammers. For example, Hearst will sell—to anyone willing to pay for it—a list with the names and addresses of all *Good Housekeeping* subscribers over age 50, who are devoted Bible-reading Democrats with three teenage children and pet cats.

---

[15]     Hann *et al.*, *The Value of Online Information Privacy: An Empirical Investigation* (Mar. 2003) at 2, *available at* http://www.comp.nus.edu.sg/~ipng/research/privacy.pdf (last visited Sept. 19, 2012) ("The real policy issue is not whether consumers value online privacy. It is obvious that people value online privacy.").

36.     Hearst does not seek its subscribers' prior consent to any of these disclosures and its subscribers remain unaware that their Personal Reading Information and other sensitive personal information is being bought and sold on the open market.

37.     Consumers can sign up for Hearst subscriptions through numerous media outlets, including the Internet, telephone, or traditional mail. Regardless of how the consumer subscribes, Hearst never requires the individual to read or agree to any terms of service, privacy policy, or information-sharing policy. Consequently, Hearst uniformly fails to obtain any form of consent from—or even provide effective notice to—its subscribers before disclosing their Personal Reading Information.

38.     As a result, Hearst disclosed and continues to disclose its customers' Personal Reading Information—including their reading habits and preferences that can "reveal intimate facts about our lives, from our political and religious beliefs to our health concerns"[16]—to anybody willing to pay for it.

39.     By and through these actions, Hearst has intentionally disclosed to third parties its Michigan subscribers' Personal Reading Information without consent, in direct violation of the VRPA and in breach of its contracts with Plaintiff and the other members of the Class.

## FACTS RELATING TO PLAINTIFF DAVID GRENKE

40.     Plaintiff David Grenke is a citizen of the State of Michigan.

41.     Grenke subscribes to *Country Living* magazine.

42.     *Country Living* is published, owned, and operated by Hearst.

43.     Grenke has never agreed to allow Hearst to sell or disclose his Personal Reading

---

[16]     *California's Reader Privacy Act Signed into Law*, Electronic Frontier Foundation (Oct. 3, 2011), https://www.eff.org/press/archives/2011/10/03 (last visited Sept. 19, 2012).

Information to anyone.

44.     Hearst has never given Grenke prior notice of any sale of his Personal Reading Information.

45.     However, beginning on the date that Grenke subscribed to *Country Living*, and continuing to the present, Hearst has disclosed, and continues to disclose, without consent or prior notice, Grenke's Personal Reading Information (*i.e.*, information that identifies Grenke as a *Country Living* subscriber) to data mining companies including Insource and others, who then supplement that information with data from their own files.

46.     Furthermore, during that same period, Hearst has sold—and continues to sell and offer for sale—mailing lists containing Grenke's Personal Reading Information to third parties seeking to contact Hearst subscribers, without first obtaining Grenke's written consent or even giving him prior notice of the sales.

47.     Because Hearst sold and disclosed his Personal Reading Information, Grenke now receives a deluge of junk mail and telephone solicitations offering, among other things, discounted magazine subscriptions. These unwanted offers waste Grenke's time, money, and resources, and cause him emotional distress, including irritation, annoyance, and anxiety and fear that his personal information will fall into the hands of thieves and scammers. This increase in harassing junk mail and phone calls received by Grenke is attributable to Hearst's sale of his Personal Reading Information.

48.     Additionally, because Grenke is entitled by law to privacy in his Personal Reading Information, and because he paid money for his subscription, Hearst's sale of Grenke's Personal Reading Information deprived Grenke of the full set of benefits to which he was entitled as part of his *Country Living* subscription, thereby causing him economic harm.

11

## CLASS ACTION ALLEGATIONS

49.     **Class Definition:** Plaintiff brings this action on behalf of himself and a proposed

Class, defined as follows:

> All Michigan residents who had their Personal Reading Information disclosed to
> third parties by Hearst without consent.

Excluded from the Class are (1) Defendant, Defendant's agents, subsidiaries, parents,

successors, predecessors, and any entity in which the Defendant or its parents have a controlling

interest and their current and former employees, officers, and directors, (2) the Judge or

Magistrate Judge to whom this case is assigned and the Judge's or Magistrate Judge's immediate

family, (3) persons who execute and file a timely request for exclusion, (4) all persons who have

previously had claims similar to those alleged herein finally adjudicated or who have released

their claims against Defendant, and (5) the legal representatives, successors, or assigns of any

such excluded person.

50.     **Numerosity:** The exact number of Class members is unknown to Plaintiff at this

time, but it is clear that individual joinder of each class member is impracticable. Defendant has

deceived, and profited from selling the Personal Reading Information of, thousands of consumers

who fall into the definition set forth above. Ultimately, members of the Class will be easily

identified through Defendant's records.

51.     **Typicality:** Plaintiff's claims are typical of the claims of the other Class

members. Plaintiff and the Class sustained damages as a result of Defendant's uniform wrongful

conduct, based upon Defendant's disclosure of Plaintiff's and the Class's Personal Reading

Information.

52.     **Adequate Representation:** Plaintiff will fairly and adequately represent and

protect the interests of the Class, and has retained counsel competent and experienced in

complex litigation and class actions. Plaintiff has no interests antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the Class members, and have the financial resources to do so. Neither Plaintiff nor his counsel have any interests adverse to those of the other Class members.

53.     **Commonality and Predominance:** Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting only individual members. Those questions with respect to the Class include, but are not limited to:

(a)     Whether Hearst is "engaged in the business of selling at retail" books or other written materials (*i.e.*, magazines);

(b)     Whether Hearst obtained consent before disclosing to third parties Plaintiff's and the Class's Personal Reading Information;

(c)     Whether Hearst's disclosure of Plaintiff's and the Class's Personal Reading Information violated the Video Rental Privacy Act, M.C.L. § 445.1712;

(d)     Whether Hearst's sale of Plaintiff's and the Class's Personal Reading Information constitutes a breach of contract; and

(e)     Whether Hearst's sale of Plaintiff's and the Class's Personal Reading Information constitutes unjust enrichment.

54.     **Superiority:** Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all Class members is impracticable. The damages suffered by the individual Class members will likely be small relative to the burden and expense of individual prosecution of the complex litigation

necessitated by Defendant's actions. Thus, it would be virtually impossible for the Class members to obtain effective relief from Defendant's misconduct on an individual basis. Even if the Class members could sustain individual litigation, it would not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

55. **Policies Generally Applicable to the Class:** This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members, and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's practices challenged herein apply to and affect the Class members uniformly, and Plaintiff's challenge of those practices hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

56. Plaintiff reserves the right to revise the definition of the Class as necessary based upon information learned in discovery.

**FIRST CAUSE OF ACTION**
**Violation of the Video Rental Privacy Act**
**(M.C.L. § 445.1712)**
**(On Behalf of Plaintiff and the Class)**

57. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

58. As a magazine publisher that sells subscriptions to consumers, Hearst is engaged in the business of selling written materials at retail. M.C.L. § 445.1712.

14

59.     By subscribing to *Country Living*, Grenke purchased written materials from Hearst. M.C.L. § 445.1712.

60.     Because Grenke purchased written materials from Hearst, Grenke is a "customer" within the meaning of the VRPA. M.C.L. § 445.1711(a).

61.     At all times relevant, and beginning on the date Grenke initiated his *Country Living* subscription, Hearst disclosed—and continues to disclose—Grenke's Personal Reading Information, which identifies Grenke as a *Country Living* subscriber, in at least two ways.

62.     First, Hearst disclosed mailing lists containing Grenke's Personal Reading Information to data mining companies including Insource and others, who then supplemented the mailing lists with additional sensitive information from their own databases, before sending the mailing lists back to Hearst.

63.     Second, Hearst sold its mailing lists containing Grenke's Personal Reading Information—enhanced with additional information from data miners—to interested third parties, who could then use the mailing lists to contact Hearst subscribers. Because the mailing lists included the additional information from the data miners, the lists were more valuable, and Hearst was able to increase its profits gained from the mailing list sales.

64.     By selling or otherwise disclosing its subscriber lists, Hearst disclosed to persons other than Grenke records or information concerning Grenke's purchase of written materials from Hearst. M.C.L. § 445.1712.

65.     The information Hearst disclosed indicates Grenke's names and address, as well as the fact that Grenke subscribes to *Country Living*. Accordingly, the records or information disclosed by Hearst indicate Grenke's identity. M.C.L. § 445.1712.

66.     At no time did Grenke ever consent to Hearst disclosing his Personal Reading

Information to anyone.

67.     Worse still, Hearst did not even give Grenke notice prior to its disclosure of his Personal Reading Information to third parties.

68.     By disclosing Grenke's Personal Reading Information, Hearst violated Grenke's common law right to privacy.

69.     By disclosing Grenke's Personal Reading Information, Hearst violated Grenke's statutorily-protected right to privacy in his reading habits. M.C.L. § 445.1712.

70.     Additionally, because Grenke and the Class paid for their Hearst subscriptions, and Hearst was obligated to comply with the VRPA, Hearst's unlawful disclosure of Grenke's and the other Class members' Personal Reading Information deprived Grenke and Class members of the full value of their paid-for subscriptions. Because Grenke and the other Class members ascribe monetary value to the privacy of their Personal Reading Information, Hearst's unlawful sale of their Personal Reading Information deprived them of paid-for value, thereby causing them economic harm.

71.     Also, because Grenke and the other Class members priced VRPA compliance into their willingness to subscribe to Hearst publications, they overpaid for their Hearst subscriptions.

72.     Hearst's disclosure of Grenke's Personal Reading Information to third parties has also caused an influx of third-party print advertisements and marketing calls to his cellular phone, causing emotional distress in the form of irritation, aggravation, anxiety, and fear that his information will be obtained and misused by thieves and scammers, as well as damages in the form of decreased available cellular phone minutes.

73.     Further, Grenke's and the other Class members' Personal Reading Information has monetary value, and Hearst's failure to comply with the VRPA deprived Grenke and the

Class of their statutorily-guaranteed right to control the disclosure and use of that data. As such,

Hearst has diluted the value of Grenke's and the other Class members' personal property, and

deprived them of the opportunity to sell their personal property at market rates for their own

financial gain. Accordingly, Grenke and the other Class members have sustained, and continue to

sustain, monetary injuries as a direct and proximate result of Hearst's violation of the VRPA.

74.     As a result of Hearst's unlawful and continued disclosure of their Personal

Reading Information, Plaintiff and the other Class members have suffered privacy and economic

injuries. On behalf of himself and the Class, Plaintiff seeks: (1) an injunction requiring

Defendant Hearst to obtain consent from Michigan subscribers prior to the disclosure of their

Personal Reading Information as required by the VRPA; (2) actual damages, including

disgorgement, or $5,000.00, whichever is greater, per Class member pursuant to M.C.L.

§ 445.1715(a); and (3) costs and reasonable attorneys' fees pursuant to M.C.L. § 445.1715(b).

**SECOND CAUSE OF ACTION**
**Breach of Contract**
**(On Behalf of Plaintiff and the Class)**

75.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

76.     Hearst offered to sell magazine subscriptions to Grenke and the other Class

members for specific prices.

77.     Grenke and the other Class members accepted Hearst's offers by agreeing to pay

the offered prices as consideration for purchasing the magazine subscriptions.

78.     Accordingly, Hearst, on the one hand, and Grenke and the other Class members,

on the other, entered into binding contracts for magazine subscriptions.

79.     Because the laws existing at the time and place of the making of a contract are

incorporated into it, the contracts between Hearst and Grenke and the other Class members

17

included obligations for the parties to abide by all applicable laws, including the VRPA.

80.    Grenke and the other Class members performed their obligations under the contracts by paying the consideration owed to Hearst for the purchase of the magazine subscriptions, and by complying with all applicable laws.

81.    The ability to control disclosure of sensitive personal information—such as Personal Reading Information—is material to any consumer transaction because it is likely to affect a consumer's decision to, or conduct regarding, purchase of a product or service.

82.    Hearst's failure to perform its contractual obligations imposed by the VRPA—*i.e.*, maintaining confidentiality of subscribers' Personal Reading Information—constitutes a material breach by Hearst of the contracts with Grenke and the other Class members.

83.    Grenke and the other Class members have suffered actual damages as a result of Hearst's breach in the form of the value Grenke and the other Class members pay for and ascribe to the confidentiality of their Personal Reading Information. This amount is tangible and will be calculated at trial.

84.    Further, a portion of the purchase price of each Hearst magazine subscription sold to Grenke and the other Class members was intended to ensure the confidentiality of Grenke's and the other Class members' Personal Reading Information, as required by the VRPA. Because Grenke and the other Class members were denied services that they paid for and were entitled to receive—*i.e.*, confidentiality of their Personal Reading Information—they incurred actual monetary damages.

85.    Additionally, because Hearst profited from its breach, Grenke and the other Class members are entitled to disgorgement of all profits obtained by Hearst from its unlawful disclosure of its subscribers' Personal Reading Information.

86.     Accordingly, Grenke and the other Class members seek an order declaring that Hearst's conduct constitutes a breach of contract, and awarding Grenke and the Class disgorgement of Hearst's unlawfully obtained profits and damages in an amount to be calculated at trial.

### THIRD CAUSE OF ACTION
#### Unjust Enrichment
#### (On Behalf of Plaintiff and the Class)
#### (In the Alternative to Breach of Contract)

87.     Plaintiff incorporates the allegations contained in paragraphs 1 through 74 as if fully set forth herein.

88.     Plaintiff's claim for unjust enrichment is brought in the alternative to his claim for breach of contract.

89.     Grenke and the Class members conferred a benefit on Hearst by providing Hearst with their Personal Reading Information and paying Hearst for their magazine subscriptions. Hearst received and retained the information and money belonging to Grenke and the Class when Grenke and the Class subscribed to Hearst publications.

90.     Hearst appreciates or has knowledge of such benefits.

91.     Under the VRPA, Grenke and the Class members were entitled to confidentiality in their Personal Reading Information as part of their subscriptions.

92.     Under principles of equity and good conscience, because Hearst failed to comply with the VRPA, Hearst should not be allowed to retain the full amount of money Hearst and the Class paid for their subscriptions or the money it received by selling Grenke's and the Class's Personal Reading Information.

93.     Grenke and the Class members have suffered actual damages as a result of Hearst's unlawful conduct in the form of the value Grenke and the Class members paid for and

ascribed to the confidentiality of their Personal Reading Information. This amount is tangible and will be calculated at trial.

94.   Further, a portion of the purchase price of each Hearst magazine subscription sold to Grenke and the other Class members was intended to ensure the confidentiality of Grenke's and the other Class members' Personal Reading Information, as required by the VRPA. Because Grenke and the other Class members were denied services that they paid for and were entitled to receive—*i.e.*, confidentiality of their Personal Reading Information—they incurred actual damages.

95.   To prevent inequity, Hearst should return to Grenke and the Class the value they ascribe to the confidentiality of their Personal Reading Information and all money derived from Hearst's sale and disclosure of Grenke's and the Class's Personal Reading Information.

96.   Accordingly, Grenke and the Class members seek an order declaring that Hearst's conduct constitutes unjust enrichment, and awarding Grenke and the Class restitution in an amount to be calculated at trial equal to the amount of money obtained by Hearst through its sale and disclosure of Hearst's and the Class's Personal Reading Information.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff David Grenke, on behalf of himself and the Class, prays that the Court enter judgment in his favor and against Hearst and for the following relief:

(1)   Certify the Class as defined above, appoint Plaintiff as Class Representative, and designate his counsel as Class Counsel;

(2)   Declare that Hearst's conduct as described herein violates the Video Rental Privacy Act, M.C.L. § 445.1712;

(3)   Declare that Hearst's conduct as described herein constitutes a breach of contract, or, in the alternative, unjust enrichment;

(4)   Award actual damages, including disgorgement, or $5,000, whichever is

greater, to each Class member, as provided by the Video Rental Privacy Act, M.C.L. § 445.1715(a);

(5)     Award injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Hearst to cease the unlawful disclosures discussed herein;

(6)     Award of reasonable attorneys' fees, interest and costs, M.C.L. § 445.1715(b); and

(7)     Such other and further relief as the Court deems equitable and just.

### DEMAND FOR TRIAL BY JURY

Plaintiff requests trial by jury of all claims that can be so tried.

Respectfully submitted,

Dated: September 24, 2012

**David Grenke**, individually and on behalf of all others similarly situated

By:/s/  Ari J. Scharg
          One of his attorneys

Ari J. Scharg
EDELSON MCGUIRE, LLC
350 N. LaSalle Street, Suite 1300
Chicago, Illinois 60654
Tel: (312) 589-6370
Fax: (312) 589-6378
ascharg@edelson.com

Christine E. Ficks (P64625)
BODMAN PLC
6th Floor at Ford Field
1901 St. Antoine Street
Detroit, Michigan 48226
Tel: (313) 393-7561
cficks@bodmanlaw.com

*Counsel for Plaintiff David Grenke*